**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Stephanie Corral, Nicole Potenzo, Lisa Waddell, and Stephanie Hansen on behalf of Themselves and a Class of Similarly Situated Persons, | ) ) ) ) | |
| | ) | **JURY DEMANDED** |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.: 23-cv-1603 |
| | ) | |
| Pooh Bah Enterprises, Inc., Rick's Cabaret Chicago, RCI Hospitality Holdings, Inc., RCI Management Services, Inc., corporations, and Eric S. Langan, Shaun Kevlin, Lou Sweilem, Brett Polulak, Grace Kim, Ursela "Midori" Takahashi, Chad Davis, Individually, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

NOW COME the Plaintiffs, Stephanie Corral, Nicole Potenzo, Lisa Waddell and Stephanie Hansen, on behalf of themselves and a class and collective of other similarly situated persons, by their undersigned attorneys, and for their complaint against Defendants, Pooh Bah Enterprises, Inc., Rick's Cabaret Chicago, RCI Hospitality Holdings, Inc., RCI Management Services, Inc., and Eric S. Langan, Shaun Kevlin, Lou Sweilem, Brett Polulak, Grace Kim, Ursela "Midori" Takahashi, Chad Davis, Individually, they state and allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs formerly worked as dancers for the Defendants, who own, manage and/or operate Rick's Cabaret, a prominent strip club in Chicago that is owned and operated by a publicly traded adult entertainment company that trades as "RICK" on the NASDAQ stock exchange. The Club's primary business is live semi-nude performances by female dancers. Defendants, through their policies, actions and practices, knowingly fostered a hostile work

environment at the Club where customers routinely committed egregious assaults and batteries on female dancers, including grabbing and groping dancers' intimate private areas under their clothing, slapping dancers, exposing their genitals, biting, choking and other outrageous and criminal acts. These attacks occurred in the open areas of the Club, in view of management and bouncers, who very frequently did nothing in response. Defendants pressured and incentivized dancers to perform "VIP" (i.e., semi-private) dances, where for obvious reasons, attacks were even more egregious and even more likely to occur. This conduct was so commonplace that Plaintiffs and the Class were routinely victimized by assaults and batteries on almost every shift they worked.

2.    By knowingly fostering this environment, Defendants created a hostile work environment for a class of similarly situated female dancers that violates Title VII, 42 U.S.C. §2000e *et seq.* Adult entertainment venues are not exempt from Title VII, and the fact that dancers work at a strip club does not make criminal conduct acceptable. If anything, it is <u>more</u> important that Title VII's protections be enforced here than in traditional workplace environments where social norms are usually sufficient on their own to deter the extreme and criminally abusive forms of conduct that are at issue here.

3.    Defendants' encouragement and assistance of the above attacks also violated the Illinois Gender Violence Act, 740 ILCS 82/1 *et seq.* and the common law of Illinois. Because some of the attacks were the result, in part, of Defendants' overserving alcohol to certain customers (particularly big spenders), Defendants also violated the Illinois Dram Shop Act, 235 ILCS 5/6-21 *et seq.*

4.    In addition, Ms. Corral and Ms. Waddell bring collective action claims for discrimination on the basis of her age (over forty). Defendants terminated Ms. Corral's and Ms.

Waddell's employment because of their age, and thus violated the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq*. Both were highly successful dancers and were popular among Defendants' customers. Defendants have a well-known practice of pushing out older dancers or not hiring them in the first place. They fired Ms. Waddell because a customer pulled out his penis when her back was turned to him, despite that she was victimized by this incident and told him immediately to put it away - the customer was not kicked out for it. They fired Ms. Corral for wearing "bottoms" that supposedly did not comply with their policies, despite that she had worn these bottoms previously, and younger dancers were wearing similar or more revealing bottoms that night but were not disciplined.

5.      Defendants conspired to intentionally misclassify dancers as "independent contractors", as set forth herein, to avoid compliance with employment statutes, including Title VII and the ADEA. Further, Defendants took affirmative and fraudulent steps to conceal the true nature of the relationship (which is one of employment), as set forth herein.

6.      Finally, Plaintiffs bring this action under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq* because the Defendants collected and stored their biometric information without first obtaining consent.

7.      Plaintiffs and other similarly situated dancers have been severely damaged by the above-described conduct. Plaintiffs bring this action to vindicate their rights and the rights of the class and collective.

## JURISDICTION

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367(a).

9.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b) because Rick's Cabaret is located in Chicago, which is in this District, and the acts complained of herein predominately occurred at that location. On information and belief, some of the individual Defendants reside in this district as well.

## PARTIES

10.     Ms. Corral worked for Defendants as a dancer at the Club from approximately late 2018 when Rick's current ownership (the RCI Defendants) acquired "VIPs," which was the Club's prior name under its previous ownership. She was fired on or about April 5, 2022. She was over forty years old at the time of her termination.

11.     Ms. Potenzo worked for Defendants as a dancer at the Club from approximately late 2018 when Rick's current ownership (the RCI Defendants) acquired "VIPs," the Club's prior name under its previous ownership until on or about December 6, 2022.

12.     Ms. Waddell worked for Defendants as a dancer at the Club from approximately late 2018 when Rick's acquired it from "VIPs." She was fired on or about February 22, 2022. She was over forty years old at the time of her termination.

13.     Ms. Hansen worked for Respondents as a dancer at the Club from approximately late 2018 when Rick's acquired it from "VIPs." She was fired in or about February 2022.

14.     Defendant Pooh Bah Enterprises, Inc. owns and operates an adult entertainment venue known as Rick's Cabaret, located at 1531 N. Kingsbury St., Chicago, IL 60642 in Chicago, Illinois.

15.     Defendant RCI Holdings, Inc. owns and operates Rick's Cabaret in Chicago, and dozens of other adult entertainment venues in various locations across the United States. RCI Holdings is involved in Rick's day-to-day operations as set forth herein.

16.     Defendant RCI Management Services operates and manages Rick's Cabaret in Chicago, along with other RCI venues. RCI Management is also involved in Rick's day-to-day operations as set forth herein.

17.     Defendant Eric S. Langan was the Chief Executive Officer and President of RCI Hospitality Holdings, Inc. at all relevant times. As described herein, Langan was responsible for and knowingly permitted the acts complained of herein.

18.     Defendant Shaun Kevlin was employed at all relevant times by Defendant RCI Management Services. As described herein, Kevlin was responsible for and knowingly permitted the acts complained of herein.

19.     Defendant Lou Sweilem was the General Manager at Rick's. As described herein, Sweilem was responsible for and knowingly permitted the acts complained of herein.

20.     Defendant Brett Polulak was a Floor Manager at Rick's. As described herein, Kevlin was responsible for and knowingly permitted the acts complained of herein.

21.     Defendant Grace Kim was a manager at Rick's. As described herein, she was responsible for and knowingly permitted the acts complained of herein.

22.     Defendant Ursela "Midori" Takahashi is a manager of the VIP area at Rick's at all relevant times. As described herein, she was responsible for and knowingly permitted the acts complained of herein.

23.     Defendant Chad Davis was a manager at Rick's at all relevant times. As described herein, he was responsible for and knowingly permitted the acts complained of herein.

24.     Plaintiffs were employees of the Defendants during their employment at Rick's within the meaning of Title VII and the ADEA, and as described below, Defendants knowingly and intentionally mis-classified them as independent contractors to evade legal obligations that apply to employees including but not limited to federal anti-discrimination statutes. The corporate Defendants were responsible for the violations herein and were Plaintiffs' employers, at all relevant times, within the meaning of Title VII and the ADEA. The individual Defendants are jointly and severally liable, with the corporate Defendants, to the extent permitted by law due to their individual participation in the violative policies and practices described herein.

## FACTS

*Defendants Created a Sexually Hostile and Abusive Work Environment in Which Female Dancers Were Repeatedly Subjected to Severe and Egregious Physical and Sexual Assaults*

25.     Throughout their employment with Defendants, the Plaintiffs, and each of them, were repeatedly assaulted and battered by customers in serious and egregious ways, on virtually every shift they worked. These types of assaults, batteries and attacks were commonplace at the Club, and all, or virtually all, dancers who worked there suffered similar incidents on a regular basis.

26.     These attacks were egregious – customers grabbed, slapped or groped Plaintiffs' and other dancers' breasts, butt and genitals; pulled down their bikini bottoms or underwear; stuck their hands inside their underwear or bikini bottoms and touched or attempted to touch

their genitals and private areas; exposed their penises; put dancers' hands or pushed their bodies onto their (erect) penises; pulled dancers' hair; put their hands around their necks; bit them; kissed them; licked them; and engaged in other similar forms of egregious non-consensual physical contact.

27.     The aforementioned assaults and batteries were unwelcome, non-consensual, and offensive. Conduct like that is never acceptable in any context.

28.     The Club fosters an environment where sexual assaults and batteries on female dancers like those described above are commonplace and dancers are touched and groped without permission by customers almost every night in open areas such as on the stage and floor. In effect, this conduct has been normalized by Defendants and is part of the Club's culture and the dancers' everyday work environment.

29.     On many occasions, customers grabbed, slapped, or groped Plaintiffs and other dancers' breasts, butt or genitals or committed other egregious acts in view of managers and/or bouncers, and the managers and bouncers did not do anything in response.

30.     Customers were almost never kicked out of the Club for assaults or batteries on dancers during Plaintiffs' employment even though these attacks occurred all the time.

31.     For instance, on one occasion, a customer grabbed Ms. Potenzo's buttocks from behind her when she was not looking. She told him, "Don't ever do that again," and reported the incident to General Manager Lou Sweilem. Sweilman told her that that customer had already spent $15,000 that night and refused to kick him out.

32.     On another occasion, Ms. Potenzo was at a table with two men and one of them repeatedly pulled her onto his lap, and groped her legs, buttocks, and breasts without her permission or consent. She told him to stop, and he lightly slapped her face and said 'You don't

obey very well' or words to that effect. Ms. Potenzo reported the incident to one of the Club's supervisors, Zoran. He did not do anything in response and the customer remained in the Club.

33.     Defendants discouraged dancers from reporting assaults and batteries by customers, and dancers were generally expected to handle these attacks on their own.

34.     To the extent that management acknowledged the issue at all, it generally blamed the dancers for customer misconduct and sexual assaults by customers. For instance, on or about February 19, 2022, Ms. Waddell was dancing with her back turned toward a customer. When she turned around, she saw that he had pulled out his penis, without her permission or consent. She told him, 'Put it away, we don't do that here.' Management fired her for this incident, despite that she was victimized and responded immediately. Management allowed him to remain in the Club even after he pulled his penis out.

35.     Defendant RCI Holdings, Inc.'s 2021 Annual Report was signed by Defendant Eric S. Langan, Director, CEO and President, along with numerous other officers of the company.

36.     Among other things, the 2021 Annual Report stated: "We have developed comprehensive policies aimed at ensuring that the operation of each of our nightclubs is conducted in conformance with local, state and federal laws. We continually monitor the actions of entertainers, waitresses and customers to ensure that proper behavior standards are met."

37.     Although it is true that Defendants monitor the actions of entertainers and customers including with cameras, the statement that Defendants ensure "proper behavior standards are met" is false, as set forth above and below.

38.     Management sometimes told dancers that they are not allowed to engage in inappropriate physical contact with the customers; but as a practice the Club does not tell customers that they cannot touch the dancers, and as set forth above, unwanted touching by customers happened all the time during Plaintiffs' employment and went unchecked. Further, on information and belief, the conduct is ongoing through the present, and nothing has changed.

39.     During Plaintiffs' employment, the Club did not train dancers on what to do if they were touched or assaulted by customers.

40.     There were no formal or established procedures for dancers to report incidents of unwanted sexual misconduct by customers to management.

41.     The Club did not tell customers they are not allowed to touch the dancers or that it prohibits non-consensual physical contact in any formal way.

42.     For instance, there were no signs posted at the Club telling customers that inappropriate touching or non-consensual physical contact is prohibited when Plaintiffs worked there.

43.     In contrast, when customers entered the Club, management ensured that a host told them pricing for the Club's "bottle service" options but the host did not communicate any rule or policy regarding unwanted touching.

44.     The Club also rigorously enforced a customer "dress code." Exh. C. The policy required customers to dress in "neat casual wear" and prohibited "baseball caps," "sandals," "excessive baggy clothing," "durags" and "hoodies," among other things.

45.     Each customer was inspected upon entry for compliance with the dress code, and customers who did not comply were frequently denied entry by the Club's door attendants.

46.     Each customer was also required to check their coats (including suit jackets) upon entry to the Club. Customers frequently and sometimes vigorously objected to this requirement; however, the Club consistently enforced it despite its unpopularity.

47.     Customers also frequently recorded dancers with their cell phones without permission. Although there was supposedly a policy against this, management usually failed to enforce it unless a dancer made a scene. This added to the hostile work environment and the "anything goes" atmosphere.

48.     Due to the lack of policies on unwanted touching and nonconsensual contact and the general atmosphere at the Club where the conduct goes undeterred, customers acted as if they were entitled to assault the dancers.

49.     For instance, dancers were often groped by customers while on stage, in public view, and nothing was done.

50.     As another example, on one occasion, a male customer grabbed Ms. Corral's breasts and after she told him 'No' he said, 'what do you mean, I am at a strip club,' or words to that effect. That attitude was very common among the Club's customers.

51.     As another example, on another occasion, while Ms. Corral was entertaining a male customer and his wife, the male customer put his hands around her neck and choked her. When she pushed him away, his wife said 'we are paying for you and can do whatever we want' or words to that effect.

52.     Ms. Corral was visibly shaken by this incident. She reported it to Defendant Brett Polulak, a floor manager, and he just told her to stay away from them and did nothing in response. She also reported it to Shaun Kevlin, RCI Management Services Inc.'s Operations Manager, and he falsely accused her of stalking the couple, blamed her for the incident, and told

her to stay away from them. He similarly took no action against the couple in response. To the contrary, the couple remained in the Club after the incident. Further, Defendants permitted that couple to return to the Club on other occasions despite this incident.

53.     On another occasion, a male customer in the VIP room spent approximately 30 minutes repeatedly and forcibly putting Ms. Potenzo's hand on his penis on top of his pants. After she told him 'No' repeatedly he said, 'isn't your job to take care of me back here' or words to that effect. She told him 'no' and that she did not appreciate being treated like a prostitute, and he said he wasted his money and walked out. Ms. Potenzo reported this incident to Ursela "Midori" Takahashi , and he made fun of her for being angry. The customer was not kicked out of the Club.

54.     Other dancers also suffered comparably egregious incidents and management similarly chose not to take action against the customers in response. To the contrary, management blamed other dancers for assaults by customers, despite that they were victimized, including as described above.

55.     Dancers are and were paid much more for "VIP" dances than other performances, and thus, Defendants incentivized and pressured dancers to perform them, knowing that attacks are even more commonplace and egregious in the "VIP" areas.

56.     Defendants, not the dancers, set the pricing schedule for VIP dances.

57.     Dancers are generally alone in a room with a customer for the duration of the performance during "VIP" dances which can last one-half hour or more.

58.     It is well-known that the sexual assaults and batteries described above occurred with even greater frequency and increased severity during "VIP" dances.

59.     On one occasion, while Ms. Hansen was performing in the VIP area, a customer choked her to the point she could barely breathe and almost lost consciousness. Management had cameras in the area, and Ms. Hansen told a manager what happened, but nothing was done, and the customer was not kicked out. Ms. Hansen was visibly shaken and left the Club for the night.

60.     On another occasion, a male customer in the VIP room continuously grabbed Ms. Potenzo, pulled her on to his lap, tried to pull down her panties or them to the side and to insert his fingers into her vagina. She told him to stop several times, that it was not allowed, and that he was hurting her. The customer then bit her hard on the neck and shoulder. She reported this incident to Chad Davis, and he just told her to stay away from him. She also reported it to Ursela "Midori" Takahashi, and she shrugged the incident off even though Ms. Potenzo's neck and shoulder were red and already starting to bruise. Later that shift, Ms. Potenzo saw that same male customer take another dancer back up to the VIP room, and that night another dancer, Jenna, told her he had also been very aggressive with her.

61.     "VIP" dances were semi-private. They generally took place in a separate area of the Club, in "VIP" rooms. The area in which the rooms are located is dimly lit, and the rooms have glass walls that are partially shielded from view by curtains.

62.     Bouncers were rarely if ever present outside the "VIP" rooms despite that assaults, batteries and other conduct described above occur there with regularity, and dancers were expected to put up with the conduct or handle it on their own.

63.     Defendants required the Club's door attendants to aggressively market "VIP" dances to all customers upon entry.

64. Defendants' funneling of dancers and customers into the "VIP" rooms knowingly and intentionally subjected them to even more egregious assaults.

65. Defendant Ursela "Midori" Takahashi is/was a manager of the VIP area at all relevant times and she ignored and knowingly failed to prevent attacks on dancers, including as described above.

66. Plaintiffs and the class of other similarly situated dancers were repeatedly and severely victimized by customers during "VIP" dances.

67. On occasion, dancers walked out of "VIP" rooms during dances due to customer attacks and were required to refund the dance fees and/or were not paid for the dance. This practice coerced dancers to put up with attacks inside the "VIP" rooms.

68. The above-described policies and practices of the Club created a dangerous and sexually hostile work environment for Plaintiffs throughout their employment, and for the class.

69. Plaintiffs suffered severe physical, psychological and emotional harm as a result of above-described environment and repeated attacks, assaults and batteries.

*Defendants Intentionally Misclassified Dancers as Independent Contractors*

70. Defendants intentionally misclassified dancers including Plaintiffs as independent contractors to evade their obligations under Federal, State and Local law.

71. Defendants operate a "strip club." Their primary business and source of revenue is live semi-nude performances by dancers, including Plaintiffs.

72. The Club controlled almost every meaningful aspect of dancers' performances and conduct at the Club – including the fees they could charge, where and when they performed, the lighting and music, promotions and importantly, security.

73. Dancers had such little control at the Club that they literally had no say over their own bodily autonomy and whether they were touched by customers, as set forth above.

74. Defendants require House Moms to read the contents of the House Mom orientation packet to newly-hired dancers. This packet contained very detailed and specific rules and requirements governing dancers' performance and conduct at the Club.

75. Defendants were aware this document undermined their legal claims that dancers are "independent contractors," and management took active steps to conceal it from dancers. For instance, there was only one copy of this document at the Club, it was kept in a locker that was locked at all times, only House Moms and management had access to the locker and they could not even show the packet to dancers much less give them a copy.

76. Grace Kim, a manager at the Club, told at least one House Mom that the Club would be in big trouble if the packet were to get out, and a Federal District Court previously found at summary judgment that dancers at Defendants' New York Club were misclassified as independent contractors. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912-13, 926 (S.D.N.Y. 2013). RCI's 2021 annual report signed by CEO Eric S. Langan referenced above characterized the company's classification of dancers as independent contractors as a "risk factor."

77. The following is a non-exhaustive list of work rules dancers were required to follow. These rules were amended or modified from time to time, at Defendants' sole discretion, but demonstrate the level of control that Defendants routinely exercised over how dancers did their jobs.

78. Dancers were not permitted to leave the Club with a customer, or to meet with a customer outside of the Club, even if the customer is a friend.

79.     Dancers were prohibited from carrying purses and cell phones on the floor.

80.     Dancers were prohibited from "chewing gum" -- they were required to use "mints" instead.

81.     Dancers were prohibited from making video calls or using the "snap chat" app in the locker room.

82.     Dancers were required to adhere to specific appearance, hygiene and dress code requirements, although as set forth above, sometimes those requirements were unequally enforced.

83.     Customers purchased "dance dollars" (also called "funny money") from the Club to pay the dancers. Dancers were required to cash out their "dance dollars" at the cage at the end of their shifts. "Dance dollars" expired after 24 hours and were not redeemable after expiration, so if a dancer failed to redeem them in that time, she forfeited her money.

84.     Dancers could not approach a customer until after the customer ordered a drink.

85.     Dancers were required to perform on stage during each shift they worked. Stage performances usually consisted of 2- or 3-song sets but dancers might have to stay longer if the DJ or management determined that was necessary. Dancers were required to take off their tops or pull down their dresses by the second song of a stage performance and they were required to wait for the next dancer to relieve them before leaving the stage; they could never leave the stage empty.

86.     "Stacking" floor dances, i.e., doing two or more consecutive floor dances and collecting the fee at the end, was prohibited by Defendants.

87.     Dancers were required check out with the house mom before leaving for the evening and before changing into their street clothes, and to pay her a fee ($10 or more).

88.     Dancers were also required to tell the DJ they were leaving for the night, and they were required to pay the DJ their fee, a minimum of $10 per night, prior to leaving.

89.     Dancers were required to pick up "dance dollars," if any, from the VIP station before they changed into street clothes at the end of their shifts. They could not pick them up in their street clothes.

90.     Dancers were required to get three signatures (from the DJ, house mom, and management) to demonstrate they had checked out (and paid) everyone as required prior to leaving.

91.     Dancers were required to tell the DJ they were leaving if they were taking a break so the DJ could take them off the stage rotation. Dancers were required to be clothed if they went outside to smoke during their shifts.

92.     Dancers were prohibited from leaving personal items in their lockers overnight; however, dancers who worked 3-4 shifts per week for 2 months were given their own permanent lockers. Dancers were required to bring their own locks for their lockers.

93.     The Club had day and night shifts for dancers. Some of the Club's dancers were assigned to work only day shifts. Day shifts were generally considered less desirable because the Club was less crowded and there was less earning potential. Management commonly referred to day shift dancers as "filler girls." Dancers who were assigned to the day shifts were generally required to leave at the end of their shifts and were not allowed to continue working into the night shift. However, dancers who complied with their "day shift" schedules were sometimes allowed to work nights as well.

94.     House moms and management often referred to dancers' "shifts" as "commitments" to maintain the (bogus) appearance that dancers were "independent contractors" and had no scheduling requirements.

95.     Dancers who failed to honor their shift commitments were subject to discipline or less favorable treatment.

96.     A big part of the house moms' job was to call dancers and obtain "commitments" from them to work certain shifts.

97.     Management kept weekly commitment sheets and daily "commitment sheets" that were in effect employee work schedules.

98.     Management and house moms regularly sent texts confirming dancers who were scheduled for the next day's shifts.

99.     Defendants could and did terminate dancers for failure to adhere to the Club's rules and policies, and for gaining weight or growing old.

*Class Action Allegations*

100.     The Named Plaintiffs brings this action on behalf of themselves and a class of similarly situated female dancers defined as follows: All current and former female dancers who worked for Rick's Cabaret Chicago at any time from the time it opened for business in or about November 2018 to the present.

101.     The members of the Class are so numerous that joinder of all members would be unfeasible and impractical. On information and belief, more than 100 dancers have been employed by Defendants during the relevant time period. Further, turnover is high and class members are geographically disbursed, including due to the nature of the positions. The identities of class members are available through records maintained by the Defendants – *inter*

*alia*, Defendants make a copy of dancers' drivers' licenses or state identification cards at the time of hire.

102. *Commonality and Predominance*: Common questions of law and fact exist as to all members of the putative Class, and the Named Plaintiffs and the putative Class have a commonality of interest in the subject matter of this suit and the remedy sought. Defendants' discriminatory policies and practices described above were generally applicable to all members of the Class, thereby making a class action superior to other forms of action.

103. Common questions of fact and law include whether dancers are employees or independent contractors, whether Defendants' policies and practices normalized assaults and batteries on dancers described above and created a hostile work environment, whether Defendants knew about and repeatedly chose not to respond to assaults and batteries on female dancers, whether Defendants discouraged dancers from reporting attacks by customers, whether Defendants failed to promulgate a sexual harassment policy that prohibited sexual assaults and unwanted misconduct by customers and provided a means for reporting incidents, whether Defendants pressured dancers to perform in "VIP" rooms knowing that attacks there were even more likely to occur, whether the attacks described above were "because of" sex, what reasonable remedial or injunctive measures can be and/or could have been taken to eliminate or prevent these attacks, whether Defendants' above described conduct was extreme and outrageous under Illinois law, whether Defendants had a duty to provide security and prevent attacks under Illinois law, and whether Defendants encouraged and assisted acts of gender violence within the meaning of the Illinois Gender Violence Act ("IGVA"), below, and whether the corporate Defendants are "persons" under the IGVA, among other common questions.

104.     The Named Plaintiffs' claims are typical of those of the class. The Named
Plaintiffs and all (or substantially all) members of the class similarly experienced unwanted
assaults, batteries and attacks by customers while dancing at Ricks due to the "anything goes"
environment in the Club and have thus similarly been injured by the same wrongful practices of
the Defendants. The Named Plaintiffs' claims are based on the same core facts and the same
legal theories as the members of the class and arise from the same course of conduct.

105.     The Named Plaintiffs will fairly and adequately represent the interests of the
Class and they do not have any interest that is contrary to or in conflict with those of the Class.
Their undersigned counsel are experienced in class action and employment litigation and are
qualified to prosecute this action.

106.     A class action is superior to any other form of action for the fair and efficient
adjudication of this lawsuit. Concentrating this litigation in one forum will promote judicial
economy and parity among the claims of individual Class members and judicial consistency in
rulings. Notice of the pendency and any resolution of this action can be efficiently provided to
Class members by mail, print, broadcast, internet, and/or multimedia publication. Requiring
each Class member to both establish individual liability and pursue an individual remedy would
be inefficient and could discourage the assertion of lawful claims by putative Class members
who are disinclined to pursue an action. The prosecution of separate actions by individual Class
members, even if possible, would create: (a) a substantial risk of inconvenient or varying
verdicts or adjudications with respect to the individual Class members against the Defendants
herein; and/or (b) legal determinations with respect to individual Class members which would,
as a practical matter, be dispositive of the other Class members not parties to the adjudications
or which would substantially impair or impede the ability of Class members to protect their

interests. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a Class action.

*Defendants Discriminated Against Corral, Waddell and*
*Other Similarly Situated Dancers Because of Their Age*

107.    Defendants also maintained a policy and practice of discriminating against older dancers because of their age. Ms. Corral and Ms. Waddell bring this claim as a collective action under the ADEA.

108.    At the time Ms. Corral was fired she was forty-three years old, and she was one of the oldest dancers at the Club, on information and belief.

109.    Ms. Waddell was also over forty years of age at the time of her termination.

110.    The Club prefers and makes concerted efforts to hire and retain dancers who are Age-30 and younger over older more qualified dancers like Ms. Corral and Ms. Waddell. For instance, the Club routinely hires young dancers over older more qualified dancers.

111.    The Club has disproportionately terminated and/or failed to renew contracts for older dancers in favor of younger dancers.

112.    Ms. Corral was terminated on or about April 5, 2022, purportedly because her bikini bottoms were not compliant and provided insufficient coverage. Her termination was a pretext for age discrimination.

113.    Prior to her termination, Corral asked management several times to clarify Defendants' policy regarding bikini bottoms and no one got back to her.

114.    On or about April 1, 2022, the house mom told her she could not work in the bikini bottoms she was wearing, even though she had worn them before, and despite that other younger dancers were on the floor and/or stage wearing bottoms that provided similar or less coverage.

115. She tried to get answers from the house mom and management about what the policy for bikini or other bottoms was but could not get a clear answer.

116. Sean Kevlin subsequently informed her that her contract was terminated purportedly for failing to comply with the policy regarding bikini bottoms, and falsely accused her of being "belligerent" when she simply asked for clarification of the policy.

117. Brett Polulak shouted at Ms. Corral and bullied her that evening, but he was not terminated despite being actually belligerent.

118. There was no legitimate basis to terminate Ms. Corral's employment, she complied with management's requests to change her bottoms and changed into shorts that were undeniably compliant.

119. As set forth above, Defendants fired Ms. Waddell for a totally illegitimate reason – because she was victimized by a customer who pulled out his penis.

120. Ms. Corral and Ms. Waddell both worked for the Club since it opened, and before that they worked for its predecessor, VIPs. They were and are experienced and successful dancers. They helped train and mentor other dancers. Their performances generated a lot of revenue for the Club.

121. They are and were qualified dancers and through the time of their terminations, they continued to receive favorable feedback from Defendants' customers.

122. Ms. Corral and Ms. Waddell's terminations were a pretext for age discrimination. They were fired because of their age.

123. On information and belief, other similarly situated older dancers were also fired because of their age.

124.    Defendants' termination of their employment was willful and intentional – they

wanted them gone because of their age.

125.    Ms. Corral and Ms. Waddell suffered significant damages as a result of their

terminations, including but not limited to lost earnings.

**COUNT I**
**TITLE VII DISCRIMINATION – SEX – HOSTILE WORK ENVIRONMENT**
**(Against the Corporate Defendants Only)**

126.     Plaintiffs repeat and reallege the allegations set forth above.

127.    At all relevant times, the corporate Defendants, and each of them, have employed

15 or more employees and are therefore employers within the meaning of Title VII. 42 U.S.C.

2000e(b).

128.    At all relevant times, the corporate Defendants, and each of them, have been

engaged in an industry affecting commerce within the meaning of 42 U.S.C. 2000e(h) and have

operated as joint employers of the dancers at Rick's Cabaret Chicago, including the Plaintiff.

129.    Plaintiffs timely filed Charges of Discrimination with the EEOC prior to filing

this lawsuit.[1]

130.    The corporate Defendants, and each of them, were directly involved in the day-to-

day operation of the Club, were aware of the hostile work environment and customer attacks on

dancers, and created this environment and materially benefitted from it, as described above.

131.    These Defendants intentionally subjected Plaintiffs and the above defined Class to

discriminatory treatment based on sex by creating a hostile work environment, which was so

severe and pervasive as to alter the terms and conditions of their employment, and by

---

[1] Plaintiffs cross-filed with the Illinois Department of Human Rights ("IDHR") and will seek leave to amend this pleading after the IDHR after it issues a Notice of Dismissal. See, 775 ILCS 5/7A-102.

knowingly failing and refusing to take prompt and appropriate remedial action to redress these hostile working conditions, all in violation of 42 U.S.C. 2000e-2.

132.    These Defendants intentionally misclassified Plaintiffs and other dancers as independent contractors as set forth above to evade the requirements of Title VII and other laws that apply and provide legal protections to employees.

133.    At all relevant times, each of the corporate Defendants possessed both actual and constructive knowledge of the hostile work environment to which Plaintiffs and the Class were subjected. Despite that knowledge, and despite possessing authority to address the conduct, each such Defendant chose not to take measures to mitigate or curtail the harassment directed toward Plaintiffs and other dancers.

134.    Defendants' acts and omissions constitute a pattern or practice of sex discrimination against Plaintiffs and the Class.

135.    Defendants discriminated against Plaintiffs and the Class with malice and/or reckless indifference to the federally protected rights of Plaintiffs and the Class.

136.    As a direct and proximate result of Defendants' failure to take adequate steps reasonably calculated to prevent customers from committing egregious and repeated assaults and batteries on Plaintiffs and the class have been injured and suffered significant damages, including as described above.

**WHEREFORE**, Plaintiffs pray that the Court award the following against each corporate Defendant, jointly and severally, for each of these claims:

A.  Certify this Count as a Class Action pursuant to Fed.R.Civ.P. 23;

B.  Designate the Named Plaintiffs as the Class Representatives;

C.  Appoint the undersigned attorneys as Class Counsel;

D. enter an Order and Judgement against Defendants declaring that their discriminatory policies and practices violate Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e et seq. and to cease and desist from engaging in these practices and order all injunctive relief necessary to prevent future attacks, assaults and batteries against female dancers;

E.  enter an Order against Defendants awarding backpay and lost wages and benefits to Plaintiffs and the Class that have been suffered as a result of the unlawful employment practices, including pre-judgment interest as permitted by law;

F. award Plaintiffs and the Class compensatory damages sufficient to make her whole;

G. award Plaintiffs and the Class punitive damages;

H. award Plaintiffs reasonable attorney's fees and costs;

I. award Plaintiffs pre- and post-judgment interest as provided by law; and

J. award Plaintiffs such other and further relief as the case may require and the Court may deem just and proper.

## COUNT II
## ILLINOIS GENDER VIOLENCE ACT
### (All Defendants)

137.    Plaintiffs repeat and realleges the allegations set forth above.

138.    The Illinois Gender Violence Act ("IGVA") provides a cause of action for any person who has been subjected to gender-related violence against persons who have perpetrated that violence. 740 ILCS 82/10. For purposes of the IGVA, "perpetrated" means either personally committing the act or acts of gender-related violence or personally encouraging or assisting the act or acts of gender-related violence. *Id*.

139.    The Illinois Statute on Statutes provides that in all statutes the word "person" may extend and be applied to corporations, and the IGVA thus covers all the Defendants including the corporate entities. 5 ILCS 70/1.05.

140.    Defendants, collectively, created an "anything goes" atmosphere in the Club in which the most abhorrent and abusive acts of violence against the Named Plaintiffs and the female dancers in the Class were encouraged, tolerated, and condoned.

141. By purposefully creating a venue that profited from this environment, and through the acts described above, Defendants, and each of them, personally encouraged and assisted repeated acts of gender-related violence against the Named Plaintiffs and other female dancers in the Class, as detailed above.

142. Defendants benefitted significantly and materially from this environment.

143. As a result of Defendants' conduct, the Named Plaintiffs and female dancers in the Class suffered repeated batteries and acts of gender-related violence within the meaning of 740 ILCS 82/5, and they worked under the constant threat, fear and apprehension that such acts of violence could recur at any time.

144. The attacks, assaults and batteries described above were because of the Named Plaintiffs' and the dancers in the Class gender (female).

145. The Named Plaintiffs and the Class have suffered significant physical, emotional and psychological damages as a result of these repeated acts gender-related violence, including as described above.

**WHEREFORE**, Plaintiffs request the Court find in their favor and against Defendants and award the following relief:

A. Certify this Count as a Class Action pursuant to Fed.R.Civ.P. 23;

B. Designate the Named Plaintiffs as the Class Representatives;

C. Appoint the undersigned attorneys as Class Counsel;

D. Award the Named Plaintiffs and the Class compensatory damages to compensate them for the physical and emotional injuries they have suffered and continue to suffer;

E. Award punitive damages as permitted by law;

F. Attorneys' fees and costs;

G. Award Post-judgment interest; and

H.  Such other and further relief as the Court deems appropriate.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(ALL DEFENDANTS)**

146.    Plaintiffs repeat and reallege the above allegations as if set forth herein.

147.    As described above, Defendants fostered an environment at the Club where customers repeatedly committed serious assaults and batteries against dancers, in view of management and bouncers and the Named Plaintiffs were repeatedly victimized, as was the Class.

148.    Defendants knowingly and intentionally required Plaintiffs and the Class to work in this environment as a condition of employment, knowing that they would be attacked on virtually every shift they worked.

149.    Dancers are often of smaller physical stature as compared to many of Defendants' customers and sometimes dancers were required to dance before groups of men.

150.    Defendants knew they were placing dancers at serious risk of physical and psychological harm by requiring them to dance semi-nude in the environment described above.

151.    Defendants knew the risk was even greater in VIP dances; however, Defendants pressured dancers to perform these dances knowing they were likely to be attacked.

152.    Defendants were in a position of power over Plaintiffs and other dancers. For instance, Defendant RCI Holdings is a large publicly-traded corporation, a leader in the adult entertainment industry, and owns dozens of Clubs across the country.

153.    Defendants' above- described conduct was extreme and outrageous.

154.    Defendants' above-described conduct was knowing and intentional.

155.    Defendants materially benefitted from the assaults and batteries that were inflicted upon Plaintiffs and other dancers.

156.    Defendants intentionally and recklessly caused the Named Plaintiffs and other dancers to suffer severe emotional distress by requiring them to endure repeated physical and sexual assaults, described above, in order to work at the Club.

157.    The Named Plaintiffs did in fact suffer severe emotional distress as a result of Defendants' above-described conduct, as described above. On information and belief, other dancers in the Class also suffered severe emotional distress as a result of the Defendants' above-described conduct.

**WHEREFORE**, Plaintiffs request the Court find in their favor and against Defendants and award the following relief:

A.  Certify this Count as a Class Action pursuant to Fed.R.Civ.P. 23, including for the common question of whether Defendants' above-described conduct was "extreme and outrageous" and "intentional" within the ambit of the tort;

B.  Designate the Named Plaintiffs as the Class Representatives;

C.  Appoint the undersigned attorneys as Class Counsel;

D.  Award compensatory damages in an amount sufficient to make Plaintiffs and the Class whole;

E.  Award lost expenses including medical expenses;

F.  Costs;

G.  Pre- and post-judgment interest.

H.  Any other relief the Court deems necessary or just.

## COUNT IV
## WILFUL AND WANTON NEGLIGENCE
## (ALL DEFENDANTS)

158.    Plaintiffs repeat and reallege the above allegations as if set forth herein.

159.    Plaintiffs plead this Count as an alternative theory of liability.

160.    Defendants voluntarily assumed a duty to provide security for all persons invited into the Club, including dancers, to ensure that criminal conduct did not occur at the Club, and that proper behavior standards were met.

161.    At all relevant times, Defendants have and have had a business relationship with the Named Plaintiffs and the dancers in the Class. Defendants invited the Named Plaintiffs and the dancers in the Class to perform at the Club. Dancers' performances were central to the Club's business -- these performances were and are the Club's core business function and its primary revenue generator. Defendants received a direct and substantial material benefit from dancers' performances.

162.    As set forth above, RCI's Annual Report to its shareholders states: "We have developed comprehensive policies aimed at ensuring that the operation of each of our nightclubs is conducted in conformance with local, state and federal laws. We continually monitor the actions of entertainers, waitresses and customers to ensure that proper behavior standards are met."

163.    Defendants maintained cameras in the Club and continuously monitored dancers and customers' behavior and conduct while the Named Plaintiffs worked there, both through the cameras and through supervision by management throughout the Club.

164.    On some occasions, management, bouncers or "house moms" did intervene, for instance told or gestured to a customer to stop touching a dancer; however, attacks went unchecked with great frequency, as set forth above.

165.    In contrast to their response to attacks on dancers, Defendants consistently intervened when customers engaged in other types of physical altercations, i.e., fighting.

166. Management enforced other policies against customers, including a dress code and a coat-check requirement. On information and belief, these policies were intended as security-measures, for instance, to deter illegal drugs or weapons in the Club.

167. Based on their policies, conduct, and their business relationship, Defendants voluntarily assumed and thus owed the Named Plaintiffs and the Class a duty of care and protection while they were dancing at the Club.

168. Dancers frequently performed (semi-nude) for male customers who were larger in stature than them, and sometimes for groups of male (and sometimes female) customers. Dancers similarly performed semi-nude and were similarly vulnerable to attacks.

169. Given the nature of her job described above, and the work environment, Defendants knew and/or should have known that dancers were susceptible to attacks by customers.

170. Given the frequency of attacks, Defendants knew and/or should have known that attacks were likely to recur and were even more likely in the VIP areas.

171. Defendants had the authority and duty to regulate customers' conduct while they were at the Club, and as set forth above, they rigorously enforced certain policies, including for instance a dress code and coat check requirement, against all customers.

172. Defendants repeatedly breached their duty and permitted dancers including the Named Plaintiffs and the class to be egregiously groped, slapped, grabbed and assaulted by customers as described above.

173. Customer attacks, assaults and batters on female dancers were foreseeable given their frequency and the nature of the business and work environment, as described above.

174.     The Named Plaintiffs suffered serious and significant physical, psychological and emotional injuries and severe emotional distress as a result of the repeated assaults and batteries by customers as described above.

175.     On information and belief, the dancers in the Class suffered serious and significant physical, psychological and emotional injuries and severe emotional distress as a result of the repeated assaults and batteries by customers as described above.

176.     Defendants' negligence was the proximate cause of these injuries – they easily could have prevented these attacks.

**WHEREFORE**, Plaintiffs request the Court find in their favor and against Defendants and award the following relief:

A.  Certify this Count as a Class Action pursuant to Fed.R.Civ.P. 23 including for the common questions described above including whether Defendants assumed a duty and whether their negligence was responsible for the injuries described above;

B.  Designate the Named Plaintiffs as the Class Representatives;

C.  Appoint the undersigned attorneys as Class Counsel;

D.  Award Plaintiffs and the Class compensatory damages necessary to make each whole;

E.  Award punitive damages as permitted by law;

F.  Award Post-judgment interest; and

G.  Such other and further relief as the Court deems appropriate.

## COUNT V
## ILLINOIS DRAM SHOP ACT

177.     Plaintiffs repeats and realleges the above allegations as if set forth herein.

178.     This Count is pleaded as an alternative theory of liability.

179.     The Club is licensed to sell beer, alcohol and liquor.

180.    Throughout Plaintiff's employment, the Club overserved customers on numerous occasions, including "big spenders."

181.    Some of the attacks described above were committed by customers who Defendants had overserved and who were visibly and obviously intoxicated before and at the time of the attacks.

182.    Defendants and Club Management knew that customers who had been overserved and were visibly intoxicated were likely to commit attacks against dancers.

183.    Some of the attacks described above were committed as a direct and proximate consequence of the customers' intoxication and the fact that Defendants overserved them.

184.    The Named Plaintiffs suffered severe physical, emotional and psychological injuries described above resulting from assaults and batteries caused by Defendants' customers who the Club overserved.

185.    On information and belief, the dancers in the Class suffered severe physical, emotional and psychological injuries described above resulting from assaults and batteries caused by Defendants' customers who the Club overserved.

**WHEREFORE**, Plaintiffs request an order against Defendants, jointly and severally, as follows:

A.  Certify this Count as a Class Action pursuant to Fed.R.Civ.P. 23 including for the common questions described above;

B.  Designate the Named Plaintiffs as the Class Representatives;

C.  Appoint the undersigned attorneys as Class Counsel;

D.  An Order against Defendants jointly and severally for all personal damages Class Members sustained, including but not limited to full compensation for the violation of their personal injuries, pain and suffering, loss of ordinary life, emotional distress, mental anguish, humiliation and loss of reputation in excess of $50,000.00 dollars;

E.  Punitive damages;

    F.  Litigation costs; and

    G.  Any and all other relief that the Court may deem just and equitable.

**COUNT VI – AGE DISCRIMINATION IN EMPLOYMENT ACT**
**(Brought by Ms. Corral and Ms. Waddell)**

186.    Plaintiffs repeat and reallege the allegations set forth above.

187.    The Age Discrimination in Employment Act makes it unlawful for any employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §621(a)(1).

188.    The foregoing conduct including Defendants' termination of Plaintiff's employment constituted unlawful age discrimination in violation of 29 U.S.C. § 621 *et seq*.

189.    The foregoing facts constituted a "willful" violation of 29 U.S.C. § 621 in that Defendants either knew or showed reckless disregard for the matter of whether the conduct was prohibited by 29 U.S.C. § 621 *et seq*.

190.    As a proximate result of the foregoing facts, Ms. Corral and Ms. Waddell suffered the loss of their jobs, lost wages, and other monetary damages.

191.    Ms. Corral and Ms. Waddell bring this Count as a collective action and at the appropriate time will file a motion for conditional certification pursuant to 29 U.S.C. 626(b) on behalf of other similarly situated dancers over the age of forty.

**WHEREFORE**, Ms. Corral and Ms. Waddell pray for relief in the form of an order and a finding of liability against Defendants, jointly and severally, as follows:

    A.    Reinstating them into their prior positions;

    B.    Ordering Defendants to cease and desist from discriminating against their employees on the basis of age;

    C.    Awarding them lost wages, incidental expenses, and other monetary losses;

D.      Awarding them an additional amount equal to the amount as liquidated damages;

E.      Awarding attorney's fees and all costs and expenses of this litigation; and

F.      Such other relief as this Court deems just and appropriate.

## COUNT VII - THE BIOMETRIC INFORMATION PRIVACY ACT
(Against the Corporate Defendants Only)

192.    Plaintiffs re-allege and incorporates Paragraphs 1 through 193 by reference as if re-pled herein.

193.    Defendants are a "private entity" under the Biometric Information Privacy Act. 740 ILCS 14/10.

194.    Plaintiffs' fingerprints qualify as "biometric identifier[s]" as defined by the Biometric Information Privacy Act. 740 ILCS 14/10.

195.    Defendants collected, stored, and redisclosed "biometric information" and "biometric identifiers" from Plaintiffs through its acquisition of information based on Plaintiff's fingerprint(s).

196.    Plaintiffs were enrolled in Defendants' biometric time keeping device when they first started working for Defendants.

197.    Defendants violated the Biometric Information Privacy Act by capturing, collecting and/or disclosing Plaintiffs' biometric information and identifiers without *first* informing Plaintiff in writing that Defendants were doing so.

**WHEREFORE**, Plaintiffs pray for a judgment against Defendants as follows:

A.      Awarding liquidated or actual monetary damages, whichever is higher, to Plaintiffs for each violation of the Biometric Information Privacy Act as provided by 740 ILCS 14/20(1)-(2);

B.     Awarding Plaintiff's reasonable attorneys' fees and costs in filing and prosecuting this matter as provided by 740 ILCS 14/20(3); and

C.     Such other and further relief as this Court deems appropriate and just as provided by 740 ILCS 14/20(4).

**PLAINTIFFS DEMAND A JURY TRIAL.**

Dated: 3/14/2023                                  Respectfully Submitted,

                                                          By: /s/ M. Nieves Bolaños
                                                          One of the Attorneys for the Plaintiffs

M. Nieves BOLAÑOS #6299128
David Fish # 6269745
nbolanos@fishlawfirm.com
dfish@fishlawfirm.com
FISH POTTER BOLAÑOS, P.C.
111 E. Wacker Drive
Suite 2300
Chicago, IL 60601